Angela BOGGS, Kimberly Hawkes, Shereece Holman, Staci Pollard, Rhonda Roenfeldt, Madilyn Wade, Plaintiffs,

v.

DIE FLIEDERMAUS, LLP., d/b/a Le Bar Bat, Jerry Shallo, Patrick Kelly, Larry Cerrone, Simon Azouley, Colin Walsh, Matt Tortoso, John Does 1–5, Defendants.

No. 99 Civ. 2451(RWS).

United States District Court, S.D. New York.

Oct. 7, 2003.

Mason & Breitenecker, New York, NY (Elizabeth A. Mason, of counsel), for Plaintiffs.

Annmarie P. Venuti, Manhasset, NY, for Defendant Die Fliedermaus & Gerald Shallo.

Ropers, Majeski, Kohn & Bentler, New York, NY, for Defendant Colin Walsh.

Matthew Tortoso, New York, NY, Defendant pro se.

Patrick Kelly, Garden City, NY, Defendant pro se.

Larry Cerrone, New York, NY, Defendant pro se.

## OPINION

SWEET, District Judge.

Plaintiffs Angela Boggs ("Boggs"), Kimberly Hawkes ("Hawkes"), Staci Pollard ("Pollard"), and Rhoda Roenfeldt ("Roenfeldt") (collectively, the "Plaintiffs") have moved for reconsideration, pursuant to Fed.R.Civ.P. 59 and Local Civil Rule 6.3, of the denial of their motion for summary judgement as against defendants Patrick Kelly ("Kelly") and Colin Walsh ("Walsh") for defamation and libel *per se* under New York common law; and against Kelly for retaliation pursuant to § 296(7) of the New York State Human Rights Law and § 8–107(6) and § 8–107(19) of the New York City Human Rights law; and Title VII. *See Boggs v. Die Fliedermaus*, 255 F.Supp.2d 291 (S.D.N.Y.2003) (*"Boggs I"*).

Defendant Laurent M. Cerrone ("Cerrone") has moved for partial summary judgment on the claims against him, pursuant to Rule 56 of the Fed.R.Civ.P. Plaintiffs, in turn, have moved for the imposition of sanctions against Cerrone, pursuant to Fed.R.Civ.P. 56(g) and 11. Defendants Die Fliedermaus and Jerry Shallo ("Shallo") have also moved for partial summary judgement against plaintiffs Hawkes, Shereece Holman ("Holman"), and Madilyn Wade ("Wade") on their claims of hostile work environment based on race (Count One of the complaint) and race discrimination (Count Three of the complaint) and for partial summary judgment against plaintiff Hawkes' claim (Count Six of the complaint), pursuant to 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.[1]

For the reasons set forth below, Plaintiffs' motion for reconsideration is granted as to Kelly, and Defendants' motions for

partial summary judgment are denied. Plaintiffs' motion for the imposition of sanctions against Cerrone is denied.

### Prior Proceedings

This action was commenced on April 2, 1999 against Die Fliedermaus, LLP, d/b/a Le Bar Bat ("Le Bar Bat"), and followed the filing of a companion case by the Equal Employment Opportunity Commission ("EEOC") against Le Bar Bat and Cerrone on March 9, 1999 (the "EOC action") (99 Civ. 1732). In addition, a criminal action was brought against Kelly alleging obstruction of justice and witness tampering. *United States v. Kelly*, 169 F.Supp.2d 171 (S.D.N.Y.2001) (the "criminal action").

The EEOC action is closed, a conviction was obtained in the criminal action, and discovery has proceeded in this action.

In January 2003, Plaintiffs moved for partial summary judgment against Kelly, Walsh, and Matt Tortoso ("Tortoso") on Count Ten of the complaint alleging defamation and libel *per se*, and the motion was denied as to Kelly and Walsh in *Boggs I*. This was the case since Walsh presented a factual issue as to his intent and Kelly presented a factual dispute as to the existence of a cooperation agreement sufficient to bar summary judgment. *Boggs I* at 293. Kelly alleged that he testified in this action by deposition rather than invoking the Fifth Amendment privilege, in reliance on an oral promise by counsel to the Plaintiffs that he would not be prosecuted further civilly. *Boggs I* at 292.

On June 30, 2003, Cerrone was granted permission to attach himself to the Die Fliedermaus and Shallo motion for partial summary judgment.

---

1. Die Fliedermaus, Shallo, and Cerrone will be collectively referred to as the "Defendants."

On August 27, 2003, the parties entered into a stipulation voluntarily dismissing with prejudice and without costs the action as against Walsh.

Plaintiffs' motion for reconsideration, Cerrone's original motion for partial summary judgment, and Plaintiffs' motion for sanctions were fully submitted on May 23, 2003. The motion for partial summary judgment by Die Fliedermaus and Shallo, to which Cerrone was subsequently attached, was fully submitted on June 25, 2003.

### The Facts

The facts are set forth based upon the Local Rule 56.1 statements of the parties and supporting declarations.

Hawkes, Holman, and Wade were employed as hostesses at Die Fliedermaus during 1997, and all three are African–American. Hawkes, Holman, and Wade assert hostile work environment claims based on race against Defendants. Hawkes additionally brings a § 1981 claim, alleging that Die Fliedermaus failed to hire her as a cocktail waitress because she was African–American.

Hawkes, Holman, and Wade allege that they were subjected to discriminatory remarks and behavior by Shallo, the owner of Le Bar Bat; Kelly, the Director of Banquets and Public Relations; Cerrone, the General Manager; and Simon Azoulay, the Executive Chef. They allege that the management of Le Bar Bat treated African–American employees in a disparaging manner[2] and that Cerrone and Shallo engaged in racially explicit slurs. They further claim Shallo either ignored them, refusing to greet them and acknowledge their presence, or yelled at them. According to Plaintiffs, Cerrone remarked it was "chocolate night" at Le Bar Bat and referred to the three of them as dark, light,

and semisweet chocolate. Cerrone also spoke to Hawkes in Ebonics for a period of two weeks. When Hawkes complained to the Assistant Manager, Tim Dunleavy, Cerrone apologized. Cerrone, however, continued to refer to Hawkes as "you people." Hawkes additionally claims she was scheduled to work on certain nights because of her race.

Hawkes and Holman allege that during the winter, it would be extremely cold at the hostess desk, located opposite the front door. Holman has a medical condition that makes her especially sensitive to cold. When Hawkes and Holman complained about the cold, Le Bar Bat placed a space heater by them. However, this space heater quickly disappeared and was not replaced. Holman only saw the space heater once.

Pursuant to Plaintiff Roenfeldt's complaints, Le Bar Bat held a meeting in November 1997 at which employees were asked to state any complaints they had about working conditions at Le Bar Bat. Holman chose not to attend, and Wade had already been terminated. Hawkes attended, but did not complain concerning racial discrimination.

At no time during Hawkes', Holman's, or Wade's employment did Le Bar Bat have any sexual or racial harassment policy in place.

Hawkes and Holman voluntarily left Le Bar Bat, while Wade was discharged for insubordination. Wade alleges that she was terminated under false charges.

### I. Plaintiffs' Motion for Reconsideration

#### A. Standard

■■■ A motion for reconsideration "is appropriate where a court overlooks 'con-

---

**2.** For instance, Cerrone called the maintenance staff "stupid."

trolling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court.'" *Banco de Seguros Del Estado v. Mut. Marine Offices, Inc.*, 230 F.Supp.2d 427, 428 (S.D.N.Y. 2002) (*quoting Range Rd. Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390, 392 (S.D.N.Y.2000)). "The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995). "[A] motion for reconsideration may be granted to 'correct a clear error or prevent manifest injustice.'" *Banco*, 230 F. Supp.2d at 428 (*quoting Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F.Supp.2d 365, 368 (S.D.N.Y. 1999)). However, this must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Dellefave v. Access Temps., Inc.*, No. 99 Civ. 6098, 2001 WL 286771, 2001 U.S. Dist. LEXIS 3165 (S.D.N.Y. Mar. 21, 2001).

### B. *Discussion*

Since, as stipulated by the parties, Walsh is voluntarily dismissed from the suit, Plaintiffs' motion for reconsideration is only relevant with regards to Kelly.

As to Kelly, Plaintiffs claim that there is no evidence in support of a cooperation agreement sufficient to bar summary judgment. According to them, both the letter by Plaintiffs' counsel, Elizabeth A. Mason, to Kelly and Kelly's deposition testimony fail to support the existence of a cooperation agreement. They further point out that Kelly has failed to provide evidence of

consideration for the cooperation agreement since he reserved the right to plead the Fifth Amendment in his deposition (Kelly Dep. at 6–9), contrary to what he previously alleged (*Boggs I* at 292).

As Kelly submitted no opposition to Plaintiffs' motion for reconsideration, partial summary judgment is now granted against Kelly on Count Ten of the complaint.

### II. *Defendants' Motions for Partial Summary Judgment*

### A. *The Summary Judgment Standard*

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see generally* 6 James Wm. Moore, et al., Moore's Federal Practice ¶ 56.15 (2d ed.1983). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richard-*

*son v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

## B. *Hostile Work Environment Claims*

Title VII affords employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of circumstances." *Cruz*, 202 F.3d at 570. It requires the weighing of multiple factors, such as the frequency of conduct, its severity, whether the conduct was physically threatening or humiliating, and whether the conduct unreasonably interfered with the employee's work performance. *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The standard for determining the severity

or pervasiveness is that of a reasonable person. *Id.* at 21, 114 S.Ct. 367.

■ Thus, "the existence of racial harassment in a hostile work environment" is "a mixed question of law and fact" involving "the application of a legal standard to a particular set of facts." *Richardson v. New York State Dep't Corr. Serv.*, 180 F.3d 426, 437 (2d Cir.1999) (citations and internal quotations omitted). "Such mixed questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Id.*

Relevant conduct includes not just behavior targeted at plaintiffs or even plaintiffs' class. As the Second Circuit explained:

> Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim. Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities ... may contribute to the overall hostility of the working environment for a minority employee.

*Cruz*, 202 F.3d at 570.

Thus, "evidence of racial harassment could be used by a plaintiff to bolster a claim of sex-based hostile working environment, and vice versa." *Sidari v. Orleans County*, 169 F.Supp.2d 158, 164 (W.D.N.Y. 2000) (finding that plaintiff "must be permitted to introduce evidence of racial and sexual discrimination ... in support of his claim for hostile work environment, since these other incidents of discrimination could reasonably have exacerbated the

harassment which plaintiff personally experienced.").

In the *Cruz* case, the Second Circuit concluded that "[g]iven the evidence of both race-based and sex-based hostility, a jury could find that Bloom's racial harassment exacerbated the effects of his sexually threatening behavior and vice versa." *Cruz,* 202 F.3d at 572 (*citing Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (recognizing that evidence of religious harassment could help support a racial hostile work environment claim); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir.1987) (noting that evidence of racial harassment may help establish a sexually hostile work environment)). However, the Second Circuit expressly reserved the question of "whether a plaintiff may aggregate evidence of racial and sexual harassment to support a hostile work environment claim where neither charge could survive on its own." *Cruz,* 202 F.3d at 572 n. 7.

This question need not be decided here either since Plaintiffs present sufficient evidence to support independent racial and sexual harassment claims. The Plaintiffs allege that the management of Le Bar Bat treated African–American employees in a disparaging manner; that Cerrone and Shallo engaged in racially explicit slurs; that Shallo either ignored them or yelled at them; that Cerrone made remarks poking fun of their skin color; that Cerrone spoke to Hawkes in Ebonics for a period of two weeks; and that they had to work in the extreme cold and uncomfortable work conditions. Hawkes further alleges that she was forced to work on certain nights because of her race, and Wade claims that she was terminated under false charges.

█ In their defense, Defendants claim that Cerrone was abusive to both minority and non-minority employees and hence he did not discriminate against the Plaintiffs.

However, abuse against various different groups—such as both women and African–Americans does not excuse behavior, but rather creates an overall hostile environment that exacerbates the effect of harassment experienced individually. *Cruz,* 202 F.3d at 570–71. The Plaintiffs further point to conduct that specifically targeted their race, including the Ebonics episode, the chocolate remark, and the "you people" remark.

█ Defendants additionally argue that Wade was not present when the Cerrone made the chocolate remark and that Holman understood he made it in a joking manner. However, the remark referred to Wade, she heard about it, and it contributed to the racial hostility of the environment where she worked. As held in *Schwapp,* "The mere fact that [plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim. Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment claim." *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997). *See also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997) (holding that incidents of sexual harassment not witnessed by plaintiff are relevant to show a pervasive hostile environment). Furthermore, racially offensive remarks are not excused if they are made in a joking manner. A reasonable jury cold conclude that Cerrone's chocolate remark, in the context of the Plaintiffs' other allegations, helped created a racially hostile environment.

As for the cold temperature under which Hawkes and Holman had to work, Defendants point out that the other hostesses of different ethnic backgrounds had to endure the same working conditions. This may be true, but the other hostesses may have been disproportionately minorities.

In any case, it was Holman and Hawkes, who are both African–American, who complained about the cold, and Holman is especially sensitive to the cold due to a medical condition. Although Defendants placed a space heater in the hostess area, it quickly disappeared (Holman only saw it once), and Defendants did nothing to rectify the situation.

■ Defendants cite to the following in support of their racial tolerance: that Le Bar Bat had a culturally diverse workforce;[3] that they allowed their employees to wear ethnic clothing; that Hawkes felt comfortable enough to talk to Cerrone and Shallo when she believed she was being stalked, and they accommodated her; and that they employed African–American hostesses, who provided patrons with their first impression of Le Bar Bat. All of this presents an issue of fact for a jury to determine whether "discriminatory intimidation, ridicule, and insult" was "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz,* 202 F.3d at 570.

### C. *Employer Liability*

■ "[A]n employee who brings a claim for hostile work environment by a supervisor is entitled to a presumption that the employer is liable for harassment." *Cruz,* 202 F.3d at 572. Then, the employer can rebut the presumption "if it can plead and prove, as an affirmative defense, that 1) the employer exercised reasonable care to prevent and promptly correct any sexual [or racial] harassment by such supervisor, and 2) the employee unreasonably failed to avail herself of any corrective or preventive opportunities provided by the employer or to avoid harm

otherwise." *Id.* (citations omitted); *see also Burlington,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher v. City of Boca Raton,* 524 U.S. 775, 806–07, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ Here, at no time during the Plaintiffs' employment did Le Bar Bat distribute an anti-racial harassment policy, conduct sensitivity training, or discipline any of the defendants for racial and sexual misconduct. While "an anti-harassment policy with complaint procedure" is not necessary "in every instance as a matter of law," certain cases may present "the need for a stated policy suitable to the employment circumstances." *Burlington,* 524 U.S. at 765, 118 S.Ct. 2257. Here, the first time any kind of discrimination policy was distributed was at least six months after Hawkes' complaint of racial harassment. When evidence creates an issue of fact as to whether the employer's action is effectively remedial and prompt, summary judgment is inappropriate. *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998); *Richardson,* 180 F.3d at 441; *Kracunas v. Iona College,* 119 F.3d 80, 90 (2d Cir.1997) (district court erred in holding that employer's response taken four to six months after learned of allegation was appropriate as matter of law).

In November 1997, Le Bar Bat held a meeting for all its employees, pursuant to Plaintiff Roenfeldt's complaints regarding harassment.[4] At that meeting, employees were given the opportunity to state their complaints. Only Hawkes attended this meeting, and she raised no issues regarding racial discrimination or hostile work environment.

---

**3.** This, however, is unavailing if the culturally diverse work force, like Hawkes, Holman, and Wade, claims to have experienced discrimination.

**4.** Roenfeldt also quit her employment at Le Bar Bat.

The Plaintiffs argue that there was nothing "remedial" about this meeting. The meeting was followed by no investigation of facts, and it does not appear to have provided an atmosphere where employees could comfortably air their complaints. The Plaintiffs allege that Kelly mocked Hawkes for the complaints she did raise at the November meeting, later approaching her and saying, "I just came to harass you because I heard you like that." They further claim that Shallo threatened Plaintiff Boggs for complaining, declaring that he would make sure she would never work in New York City again. According to Plaintiffs, these comments were part of a pattern where supervisors routinely dismissed or mocked Plaintiffs' informal and formal complaints. It is thus a question for the jury whether Le Bar Bat "exercised reasonable care to prevent and promptly correct" harassment, and whether the Plaintiffs "unreasonably failed to avail [themselves] of any corrective or preventive opportunities provided by the employer." *Cruz*, 202 F.3d at 572.

Hawkes complained to Assistant Manager Tim Dunleavy of racial harassment when Cerrone spoke to her in Ebonics for a period of two weeks. After Hawkes' complaint, Cerrone apologized and no longer spoke to her in Ebonics, but he continued to disparage Hawkes and the other African–American employees because of their skin color, referring to them as dark, light, and semisweet chocolate, and he subsequently referred to Hawkes as "you people."

### D. *Hawkes' § 1981 Claim*

 Hawkes' § 1981 claim is based upon Le Bar Bat's failure to promote her from a hostess position to cocktail waitress. In order to state a claim for failure to promote, Hawkes must satisfy the *McDonnell Douglas* test. *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must establish a prima facie case of racial discrimination by showing that (1) plaintiff belongs to a racial minority; (2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, plaintiff was rejected; and (4) the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Id.* at 802, 93 S.Ct. 1817. *See also Cruz*, 202 F.3d at 565 ("In order to establish a prima facie case for failure to promote, the plaintiff must allege that: 1) she 'is a member of a protected class'; 2) her job performance was satisfactory; 3) she applied for and was denied a promotion to a position for which she was qualified; and 4) the position 'remained open and the employer continued to seek applicants.' ").

 Here, Hawkes alleges the four required elements. She is African–American. She expressed the desire to train for the position of a cocktail waitress in July of 1997. Hawkes further alleges that Le Bar Bat continued to seek applicants from persons with her qualifications and less and hired ten of those applicants from July till December 1997, all of whom were not African–American. One if not more of the new hires had no prior experience as a cocktail waitress.

 After the prima facie case is established, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817. Here, Defendants claim that Hawkes' was inadequately qualified pointing out that Hawkes worked only two or three shifts as a waitress during the period of October 1995 to August 1996. During that time, Hawkes was primarily a bus person at Geronimo's, a restaurant in

Santa Fe. By listing her position as a waitress at Geronimo's, Hawkes' resume was thus misleading. This may be true, but it is unclear whether the management at Le Bar Bat knew this at the time or how Hawkes' qualifications relate to the cocktail waitresses actually hired. Defendants further claim that of the ten alleged cocktail waitresses hired after Hawkes sought the position, one was hired as a hostess and one was Asian. Laurie Kean, an African–American, was hired as a cocktail waitress on November 14, 1997.

■■■ Finally, the plaintiff must then "be afforded a fair opportunity to show" that the employer's stated reason for rejection was "in fact pretext." *McDonnell*, 411 U.S. at 804, 93 S.Ct. 1817. Hawkes does not contest that she worked only two or three shifts as a waitress at Geronimo's, but points out that at least one of the new hires had no prior experience as a cocktail waitress. "Other evidence that may be relevant to any showing of pretext includes facts as to the [defendants'] treatment of [plaintiff] during his ... term of employment; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful ..." *Id.* at 804–05, 93 S.Ct. 1817. The Plaintiffs remark that there has only been one African–American cocktail waitress out of a total of 36 cocktail waitresses. Defendants, however, point out that Le Bar Bat has a generally culturally diverse work force with people working on the floor who are African–American, Asian, and Hispanic. There are African–American bartenders, and Hawkes, as an African–American hostess, was the first impression Le Bar Bat presented to its patrons. Thus, here again is an issue of fact for the jury to decide.

### E. *Cerrone's Summary Judgement Motion*

Cerrone, *pro se*, moves for summary judgment on the basis of the following:

(1) The factual record does not demonstrate that Defendant Cerrone made any comments of an explicitly sexual nature to the Plaintiffs, nor have they accused him of making any sexual advances to them;

(2) The factual record does not demonstrate that Defendant Cerrone attempted to see them outside of the workplace for events of a personal nature;

(3) The factual record does not demonstrate that Defendant Cerrone prevented the Plaintiffs from normal advancement due to reasons of a sexual and/or racial nature; and

(4) No physical improprieties are claimed by the Plaintiffs.

Cerrone further cites his financial hardship and that he has "lost all gainful employment in his chosen profession of over 25 years and is virtually unemployable in the Hospitality field due to the accompanying stigma associated with this action in New York." (Cerrone Mem. at 3.)

Plaintiffs respond that Cerrone's motion is "defective and improper" and "frivolous and flawed." (Pls.' Opp. at 2.) They point out that Cerrone "provided no argument with respect to his motion," "fail[ed] to identify any material facts which would support his conclusory allegations," and "failed to provide a statement of the material facts that are not in dispute," pursuant to Fed.R.Civ.P. 56. *Id.*

In opposition to Cerrone's contentions, Plaintiffs submit Roenfeldt's deposition testimony, in which she alleges that Cerrone frequently made comments of a sexual nature and to her and engaged in unwanted physical contact, including hug-

ging, kissing, and rubbing her shoulders. Roenfeldt eventually quit her job at Le Bar Bat due to this sexual harassment. Hawkes' deposition testimony likewise includes instances of sexual and racial harassment by Cerrone. (Pls.' Opp. at 3–4.) Accordingly and as set forth above, there remain issues of material fact to be resolved at trial, and Cerrone's motion for summary judgment is denied.

### III. *Plaintiffs' Motion for Sanctions*

█ Additionally, Plaintiffs request the imposition of sanctions on Cerrone, pursuant to Fed.R.Civ.P. 56(g) and Fed.R.Civ.P. 11, since he "utterly failed to demonstrate a good faith basis for bringing this motion," and he "filed this motion for no other reason than to harass plaintiffs." (Pls.' Opp. at 6.)

Under Fed.R.Civ.P. 56(g), "[s]hould it appear to the satisfaction of the court at any time" that affidavits have been filed "in bad faith or solely for the purpose of delay," the court can impose sanctions on the offending party. Under Fed.R.Civ.P. 11, sanctions may be awarded when a pleading is presented for improper purpose, legal contentions are not warranted by existing law, factual contentions do not have evidentiary support, or the denial of factions contentions is unwarranted on the evidence. "A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(2). Sanctions are appropriate for parties who are "acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *Sassower v. Field,* 973 F.2d 75, 80—81 (2d Cir. 1992) *(citing Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

Sanctions are inappropriate in this case as Cerrone is a *pro se* litigant, there is no evidence he filed his motion in bad faith, he has not filed repeated motions lacking in merit, and he has received no prior warnings from the Court. Because Cerrone is a *pro se* litigant, the imposition of sanctions for conduct about which he had not been explicitly warned is improper. *See Commer v. American Fed'n of State, Count and Municipal Employees,* No. 02 Civ. 7930, 2003 WL 21698637, at *6 (S.D.N.Y. July, 17, 2003); *see also Golub v. Univ. of Chicago,* Nos. 87 civ. 2891, 88 Civ. 0597, 1992 WL 333641, at *3 (E.D.N.Y. Oct.26, 1992) (sanctioning a *pro se* litigant who had been "adequately warned of the consequences which may result from his behavior.").

### *Conclusion*

For the reasons set forth, Plaintiffs' motion for reconsideration is granted as to Kelly, and Defendants' motions for summary judgment are denied. Plaintiffs' motion for the imposition of sanctions against Cerrone is also denied.

Enter judgment on notice.

It is so ordered.