# IN THE SUPREME COURT OF IOWA

No. 16–1014

Filed May 19, 2017

Amended August 2, 2017

**SIMON SEEDING & SOD, INC.,**

 Appellant,

vs.

**DUBUQUE HUMAN RIGHTS COMMISSION**
and **JERMAINE STAPLETON,**

 Appellees.

---

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

Employer appeals district court judgment upholding local commission's award of damages to former employee for racial discrimination. **DISTRICT COURT JUDGMENT AFFIRMED.**

Erik W. Fern of Putnam, Fern & Thompson Law Office, P.L.L.C., Decorah, for appellant.

Les V. Reddick of Kane, Norby & Reddick, P.C., Dubuque, for appellee Dubuque Human Rights Commission.

Charles Gribble and Christopher Stewart of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellee Jermaine Stapleton.

**WATERMAN, Justice.**

In this appeal, we must decide how to count employees to reach the threshold "numerosity" required to apply a local civil rights ordinance to a small business. The Dubuque ordinance, with language matching the Iowa Civil Rights Act (ICRA), exempts "any employer who regularly employs less than four individuals." The defendant, a landscaper whose hiring needs fluctuate seasonally, denies it met this threshold under its proposed formula of counting only workers who had been employed for twenty consecutive weeks. The Dubuque Human Rights Commission (DHRC) rejected the employer's numerosity challenge, found the employer racially discriminated against a temporary worker, and awarded damages. The district court affirmed. We retained the employer's appeal.

For the reasons explained below, we conclude the DHRC correctly determined that the defendant "regularly employed" the requisite four or more individuals during its landscaping season. The DHRC properly used a payroll approach and rejected the employer's proposed twenty-week test. Because substantial evidence supports the DHRC's findings, we affirm the district court judgment upholding the damages awarded to the former employee.

### I. Background Facts and Proceedings.

The agency record establishes the following facts. Simon Seeding & Sod, Inc. (Simon Seeding) operates a seasonal landscaping business based in Dubuque, Iowa. Jermaine Stapleton, now age thirty-three, worked for Simon Seeding in 2006 and again in 2012. Stapleton, an African-American, claims that Simon Seeding's owner, Leo Simon, discriminated against him based on his race.

**A. Events Leading to the Complaint.** Stapleton grew up in Burnsville, Minnesota, and moved to Dubuque to attend Clarke College. He began working for Simon Seeding in April 2006. Stapleton recalled that Leo regularly referred to him using racial epithets while working, such as "chocolate guy" and "colored lad." Stapleton did not respond "in kind," but in his words,

> [A] few times I asked him, you know, not to do it but, you know, it was so continuous that it almost became, you know, an everyday thing so I just kind of took it all in stride because I needed the job so—

Stapleton ceased working at Simon Seeding in September of 2006. He returned to work there six years later.

Meanwhile, in 2008, Stapleton was convicted of possession of a controlled substance and sentenced to probation. In 2009, he was arrested for operating a motor vehicle while intoxicated, and the district court ordered him to the First Judicial District Dubuque Residential/Work Release Facility (work-release facility). Stapleton tested positive for narcotics and was sent to prison. In 2012, he was transferred from prison into the work-release facility, where residents were required to maintain employment. Stapleton approached Frank Berwanger, another resident, about returning to work at Simon Seeding. Berwanger worked for Leo there. Stapleton told Berwanger to tell Leo that he was the "colored guy" who worked for Leo in 2006. Leo did not remember Stapleton, but nonetheless hired him back at $8 per hour for twenty hours per week.

Stapleton resumed working for Simon Seeding on March 15. Leo resumed calling him "chocolate guy," "chocolate lad," and "colored lad." Stapleton estimated Leo made such comments to him two or three times weekly. "Ninety percent of the time" Stapleton would ask Leo not to call

him those words. Leo responded, "Oh Jay, don't worry, it's not that big of a deal, I'm just joking." Stapleton obtained another full-time job at Roofco in April, but continued to work for Simon Seeding part-time because he did not want to be disciplined at the work-release facility for quitting.

On May 6, Leo picked Stapleton up from the work-release facility to drive with him to a job site in Wisconsin. Leo stated that Stapleton did not seem "right," and Leo believed he may be "on" something. He asked Stapleton if he really wanted to work that day, and Stapleton said he did. When they arrived at the job site, it was raining and muddy. Leo could not find a chain he needed to pull machinery out of the mud. He said to Stapleton, "Stupid colored mother fucker, find my chain now!" Stapleton responded, "Man, can you please stop calling me that." Leo retorted, "Well, if you don't like it, you can walk home." Stapleton began walking back to the work-release facility, fifty to sixty miles away. A half hour later, a police officer stopped Stapleton to ask why he was walking along the highway. Stapleton explained the situation, and the police officer drove Stapleton back to the job site. The officer told Leo that Leo was responsible for getting Stapleton back to the work-release facility.

Meanwhile, Leo had called the work-release facility and spoken with residential officer Gael Huinker, who made the following notes:

> At 1015 hours this date, this RO received a phone call from Leo Simon. Mr. Simon stated that when he picked Mr. Stapleton up for work this date he didn't feel like Mr. Stapleton really felt like working. . . . Mr. Simon then stated when they got to Dodgeville it was raining so they sat in the truck a while and when it stopped Mr. Stapleton took some pictures and then didn't want to do anything else. . . . Mr. Simon then asked this RO if we could pick Mr. Stapleton up or if he could walk back. This RO began to ask a lot of questions, asking some of them 2-3 times b/c the whole situation was a bit confusing and Mr. Simon was giving real short answers. Mr. Simon was informed by this RO that

> Mr. Stapleton was not allowed to walk back to the facility and asked if he could [stay] on site until the end of the day. This RO also asked Mr. Simon to inform Mr. Stapleton that he is not allowed to walk back and to please call us if anything is resolved.

At 10:26 a.m., Leo called back and said Stapleton was "walking over the hill." At 11 a.m., he called again to say a police officer had brought Stapleton back to the job site. At 11:27 a.m., he called a fourth time to report that Stapleton was "taking pictures again" and that "everything had worked out." At 1 p.m., Leo dropped Stapleton off at the work-release facility, and Huinker observed the pair seemed to be getting along and were laughing together. Stapleton informed her it "started over a chain" and that Leo called him a racial slur.

The next day, Stapleton called Leo to pick him up for work. Leo told Stapleton that he did not need him anymore. Stapleton never worked for Simon Seeding again.

Huinker received a complaint from another resident on May 6 about Leo's discriminatory behavior. Stephen Toliver had worked for Simon Seeding for one day when he told Huinker that Leo had called him a "nigger" several times. Toliver told Huinker he "realize[d] Mr. Simon [was] probably just used to saying things like that because he has been doing it for so long." He asked Leo to call him Steve. Leo requested that Toliver not be placed for work with him any longer because he did not think Toliver "was a very hard worker."

Huinker discussed the complaints with Wendy Lyons, the work-release facility's residential manager. Neither Stapleton nor Toliver was disciplined for losing their jobs because they had alleged discrimination. On May 29, Lyons decided the facility would no longer place residents with Simon Seeding. Leo phoned Lyons to protest her decision and

called back twice to say he was not racist and did not appreciate being called racist.

**B. The Complaint and Investigation.** Stapleton filed his complaint with the DHRC on May 16, 2012. He alleged discrimination in violation of Dubuque City Ordinance 8-3-3, the city's counterpart to the ICRA. The DHRC sent the first of eight letters to Leo on May 25, requesting a formal response to the complaint and certain employment documentation. Leo failed to respond. Seven more letters went unanswered as the investigation continued over the next fourteen months. On November 15, 2013, the DHRC requested a subpoena for the employment documentation, including W-2s, copies of payroll records, and a list of employees. In December, the subpoena was served on Simon Seeding. By February 2014, no information had been received. The DHRC contacted Leo, who named his accountant. The accountant responded to the investigator's direct inquiry by providing the DHRC with Simon Seeding's payroll journal and tax information.

The payroll listed the only employees in 2012 as Leo, John Berwanger, Frank Berwanger, and Jesse Weiland, without including Stapleton. The DHRC found a note dated April 3, 2012, at the work-release facility that stated Stapleton had been paid "for 40.5 hours of the week this date." The DHRC found there was probable cause to investigate.

In February 2015, a public hearing was held before an administrative law judge and two commissioners (the panel). Stapleton, his mother, his ex-girlfriend, and Wendy Lyons testified on his behalf. Leo, Frank Berwanger, Greg James, Jody James, and Erica Wiles (other employees) testified for Simon Seeding.

Stapleton testified he overheard Leo refer to him as "colored" or "chocolate" to Berwanger and others at the worksite. He testified about the impact Leo's statements had on him. He had been "happy-go-lucky," "open-minded," and "funny." But Leo's racial slurs changed his attitude:

> Q. And did anything change after the series of remarks that you described to us earlier in your testimony? A. I'd say a lot changed. I, you know, went from super high character to, you know, self-pity to just, you know, yelling at my girl, yelling at my mom, getting real irritable. There'd be nights in the halfway house where I'd just stay up all night, you know, just—I was struggling especially bad.

Stapleton sought counseling to deal with his emotional difficulties. He attended one session but did not continue because he lacked insurance and could not afford it. Stapleton described Leo's effect on him as a "scar that never goes away."

Stapleton's mother testified she noticed a change in him. They spoke daily by phone, and he kept her informed as to what Leo called him. She noticed that her son became depressed and agitated. She testified that Stapleton now lives with her in Minnesota, and he still talks about what Leo said and did. The incidents "bring[] back the feeling of destitution, of there's nothing I can do about it. Nobody cares about it." Stapleton's ex-girlfriend testified similarly, stating Stapleton would "lash out" and was not getting any sleep because of the way he was treated. On cross-examination, defense counsel raised Stapleton's history of drug abuse and residency in the halfway house. Defense counsel suggested those stressors caused Stapleton's depression and anxiety.

Berwanger and Leo denied the incidents described by Stapleton. Berwanger testified he worked with Stapleton about "ninety percent" of the time, and he never heard Leo make any disparaging racial remarks. Berwanger did not believe there was "any truth to Mr. Stapleton's

allegations." Greg James testified he is African-American and has a biracial family, and Leo has never given any indication of racist feelings. His wife, Jody James, testified similarly.

Leo described the record keeping at Simon Seeding. He admitted there were some employees that were not on the payroll records, including Jody James and Stapleton:

> Q. Okay. Are there some employees that would not have been accounted for by [the accountant]? A. Right, and some of them, if they—you know, some only helped a half a day or a day or something or somebody would bring their buddy along; you know what I mean?
>
> Q. And you wouldn't pay them through a payroll check, you'd just pay them on the spot? A. Yeah, because that's what some of them wanted, same-day pay; you know what I mean?
>
> . . . .
>
> Q. Did you hear [Jody James] testify that she did work for you between March 15th and May 6th of 2012? A. Right, and as you said, she wasn't always on the payroll. They had got gas for some wages and stuff like that was advantage to them. They weren't all on the payroll.
>
> Q. And I don't see Jermaine Stapleton on this April 1st to June 30th period of time either. Didn't he work for you? A. Right. He only worked a hundred and thirty-eight hours. He was not full time.
>
> Q. So you paid a number of other people who aren't listed here for their services during that period of time; isn't that correct? A. Not a ton of people, a few but not a ton.

On March 30, the panel issued a proposed decision, finding Simon Seeding had engaged in prohibited racially discriminatory conduct. In determining whether Simon Seeding "regularly employed" four individuals to bring it within the ordinance, the panel defined that term to mean "at regular intervals." From the employer's tax and payroll documents, the panel determined,

> For the weeks of March 18, 2012, March 25, 2012, April 1, 2012, April 8, 2012, April 29, 2012, May 20, 2012, and May 27, 2012, September 23, 2012, and September 30,

2012, Simon Seeding employed five employees. During the weeks of April 15, 2012 and April 22, 2012, Simon Seeding employed six employees. For the weeks of May 6, 2012, May 13, 2012, June 3, 2012, June 10, 2012, June 17, 2012, June 24, 2012, July 1, 2012, September 16, 2012, Simon Seeding employed four employees. Simon Seeding's records show Simon Seeding employed four or more employees for 19 weeks in 2012.

The panel also questioned "the accuracy of Simon Seeding's payroll and tax records." The panel identified several individuals Simon Seeding admittedly employed but omitted from its payroll records. The panel found "Simon Seeding regularly employed four or more employees in 2012."

The panel determined Leo had subjected Stapleton to a hostile work environment. It found, "Stapleton's testimony is reasonable and consistent with the other evidence the panel believes; Leo Simon's testimony is not." The panel also noted, "Stapleton made contemporaneous reports of Leo Simon's racial slurs to the work release facility, to his mother, and to his girlfriend." Leo initially denied using racial slurs, but later admitted he may have made them in a joking manner. The panel awarded $2817 in lost wages, $15,000 in emotional distress damages, and $29,400 in attorney fees. Both parties appealed.

The DHRC affirmed the proposed decision by a vote of 6–1. The DHRC increased Stapleton's lost wages to $4500 by correcting the panel's math error. The DHRC tripled the emotional distress award to $45,000, without explanation. The DHRC found the attorney fees claimed by Stapleton were not excessive, affirmed the $29,400 fee award, and awarded an additional $1600 for the administrative appeal.

Simon Seeding filed a petition for judicial review in district court. It argued it did not employ the requisite number of employees to be subject to the Dubuque ordinance and denied Stapleton's allegations of

racial discrimination. It also contended the evidence was insufficient to award lost wages and emotional distress. The district court affirmed the DHRC's decision and awarded an additional $4500 in attorney fees for the judicial review.

Simon Seeding appealed, and we retained the case.

## II. Standard of Review.

"[F]inal decisions of municipal civil rights commissions [are] reviewable to the same extent as final decisions of the Iowa Civil Rights Commission (ICRC)." *Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n*, 850 N.W.2d 326, 332 (Iowa 2014). Iowa Code section 17A.19(10) controls judicial review of an ICRC decision. *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). The burden of demonstrating invalidity of the agency action rests on the party asserting the invalidity. Iowa Code § 17A.19(8)(*a*) (2015).

"[O]ur standard of review depends on the aspect of the agency's decision that forms the basis of the petition for judicial review." *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256 (Iowa 2012). "[A] reviewing court can only disturb . . . factual findings if they are 'not supported by substantial evidence in the record before the court when that record is reviewed as a whole.'" *Id.* (quoting Iowa Code § 17A.19(10)(*f*)).

> "*When that record is viewed as a whole*" means that the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, *including any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses* and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

Iowa Code § 17A.19(10)(*f*)(3) (second emphasis added).

When reviewing an agency's interpretation of law, "[t]he level of deference afforded . . . depends on whether the authority to interpret that law has 'clearly been vested by a provision of law in the discretion of the agency.' " *Burton*, 813 N.W.2d at 256 (quoting Iowa Code § 17A.19(10)(*c*)). If the legislature did not clearly vest the agency with interpretive authority, we review for correction of errors at law. Iowa Code § 17A.19(10)(*c*). An agency has been "clearly vested" with interpretive authority only when we have a "firm conviction" that "the legislature actually intended . . . to delegate to the agency interpretive power with the binding force of law." *Renda*, 784 N.W.2d at 11 (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998) [hereinafter Bonfield]).

> Normally, the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly so, a court is free to, and usually does, substitute its judgment *de novo* for that of the agency . . . .

*Id.* (quoting Bonfield at 62).

The DHRC argues we should defer to its interpretation of the phrase "regularly employs." We disagree. No Dubuque ordinance or Iowa statute expressly vests the DHRC with interpretive authority. *See Renda,* 784 N.W.2d at 14. The phrase "regularly employ[s]" is not a specialized term of art requiring the agency's unique expertise to apply. *Id.* The phrase is used in other Iowa statutes.[1] *See id.* ("When the provisions to be interpreted are found in a statute other than the statute

---

[1]Iowa Code § 216.6A(4) (stating wage discrimination shall not apply to "any employer who regularly employs less than four individuals"); *id.* § 809A.1 (stating "seizing agency" under Forfeiture Reform Act means agency that "regularly employs law enforcement officers").

the agency has been tasked with enforcing, we have generally concluded interpretive power was not vested in the agency."). "Accordingly, we do not give deference to the agency's interpretation and will substitute our judgment . . . if we conclude the [DHRC] made an error of law." *Id.* at 14–15.

We review the excessiveness of an award of damages for abuse of discretion. *Lynch v. City of Des Moines* (*Lynch I*), 454 N.W.2d 827, 836 (Iowa 1990). Our review of the amount of attorney fees awarded in a civil rights action is for abuse of discretion. *Lynch v. City of Des Moines* (*Lynch II*), 464 N.W.2d 236, 238 (Iowa 1990). We will not find an abuse of discretion unless it is shown "that such discretion was exercised on grounds . . . clearly untenable or, to an extent clearly unreasonable." *Id.* (alteration in original) (quoting *State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982)).

### III. Analysis.

We must decide whether Simon Seeding falls within the small-employer exemption of the Dubuque ordinance, which turns on whether it "regularly employs" four or more persons. We have not previously interpreted that phrase found in the ICRA and other Iowa statutes. We conclude the numerosity requirement has been met in this case and reject Simon Seeding's other challenges to the award.

**A. Whether Simon Seeding Regularly Employed Four or More Individuals.** We begin our analysis with an overview of the legal framework. "Iowa Code section 216.19 authorizes a city to adopt its own civil rights ordinance." *Botsko v. Davenport Civil Rights Comm'n*, 774 N.W.2d 841, 845 (Iowa 2009); *see also* Iowa Code § 216.19(1)(*c*) (stating ICRA not intended to "limit[] a city or local government from enacting any ordinance or other law which prohibits broader or different categories of

unfair or discriminatory practices"). Dubuque Ordinance section 8-3-3, patterned after the ICRA, provides,

> A. Prohibited Practices: It shall be an unfair or discriminatory practice for any:
>
> 1. Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the race, creed, color, sex, age, national origin, religion, sexual orientation, or gender identity of such applicant or employee, unless based upon the nature of the occupation.

Dubuque, Iowa, Code of Ordinances § 8-3-3(A)(1) (2016); *see also* Iowa Code § 216.6(1)(*a*). Both the ICRA and the Dubuque ordinance include this small-employer exemption:

> 2. This section shall not apply to:
>
> a. Any employer who *regularly employs less than four (4) individuals.* For purposes of this subsection, the owners, owners' spouses, and children shall not be counted as employees.

*Id.* § 8-3-3(B)(2)(a) (emphasis added); *see also* Iowa Code § 216.6(6)(*a*) (same).

"Local civil rights ordinances must be consistent with the civil rights statute." *Consol. Freightways, Inc. v. Cedar Rapids Civil Rights Comm'n*, 366 N.W.2d 522, 526 (Iowa 1985). "It follows that when ordinances contain provisions identical to those in the statute the provisions have the same meaning." *Id.* Section 216.19 of the ICRA permits local ordinances to prohibit "broader or different categories of unfair or discriminatory *practices*," but it does not authorize ordinances to expand *coverage* to employers not otherwise included. *Baker v. City of Iowa City*, 750 N.W.2d 93, 100–01 (Iowa 2008) (emphasis added) (quoting Iowa Code § 216.19). The phrase "regularly employs" under Dubuque's

ordinance therefore must have the same meaning under the ICRA's exemption in section 216.6(6)(*a*).

1. *Is the numerosity requirement jurisdictional?* Simon Seeding argues the numerosity requirement is a matter of subject-matter jurisdiction. The DHRC disagrees. We reiterate "the importance of resolving jurisdictional issues first, especially those involving subject matter jurisdiction." *State v. Lasley*, 705 N.W.2d 481, 485 (Iowa 2005).

"[Lack] of subject matter jurisdiction can be raised at any time." *State v. Mandicino*, 509 N.W.2d 481, 482 (Iowa 1993). "Subject matter jurisdiction refers to 'the authority of a court to hear and determine cases of the *general class* to which the proceedings in question belong, not merely the particular case then occupying the court's attention.'" *Alliant Energy-Interstate Power & Light Co. v. Duckett*, 732 N.W.2d 869, 874–75 (Iowa 2007) (quoting *Christie v. Rolscreen Co.*, 448 N.W.2d 447, 450 (Iowa 1989)). "If a court enters a judgment without jurisdiction over the subject matter, the judgment is void and subject to collateral attack." *Klinge v. Bentien*, 725 N.W.2d 13, 16 (Iowa 2006).

In *Arbaugh v. Y&H Corp.*, the United States Supreme Court held Title VII's fifteen-employee numerosity requirement is not jurisdictional, but rather is a merits-based substantive proof requirement. 546 U.S. 500, 515, 126 S. Ct. 1235, 1245 (2006). First, the Court emphasized subject-matter jurisdiction "can never be forfeited or waived," and it had the obligation to raise the inquiry on its own motion. *Id.* at 501, 126 S. Ct. at 1237 (quoting *United States v. Cotton*, 535 U.S. 625, 630, 122 S. Ct. 1781, 1785 (2002)). But "[n]othing in the text of Title VII indicate[d] that Congress intended courts, on their own motion, to assure that the employee-numerosity requirement is met." *Id.* at 514, 126 S. Ct. at 1244. Second, when subject-matter jurisdiction "turns on contested

facts," the judge may resolve the dispute. *Id.* However, the "jury [was] the proper trier" of the numerosity requirement, which involved an "essential element of a claim for relief." *Id.* Finally, the Court noted the unfairness and "waste of judicial resources" that would entail if the numerosity requirement were jurisdictional because a party could raise the issue after trial and vacate the judgment. *Id.* at 515, 126 S. Ct. at 1245. The Court concluded, "[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.* at 516, 126 S. Ct. at 1245. We find the *Arbaugh* analysis persuasive and hold the numerosity requirement in the ICRA and Dubuque ordinance is not jurisdictional.

Simon Seeding argues *Arbaugh* is inapposite because the ICRA is structured differently than the Federal Act. Title VII includes the fifteen-employee threshold in the statutory definition for the word "employer." Civil Rights Act of 1964, Pub. L. No. 88–352, § 701(b), 78 Stat. 241, 253 (codified as amended at 42 U.S.C. § 2000e(b) (2012)).[2] The ICRA, however, defines "employer" to include "the state of Iowa . . . and every other person employing employees within the state." Iowa Code § 216.2(7). The numerosity requirement is placed in the substantive portion of the Act. *See id.* § 216.6 (entitled "Unfair employment practices"). That placement reinforces our conclusion it is a merits-based element of proof required for liability, rather than a jurisdictional prerequisite. Whether an employer "regularly employs" four or more employees, as this case shows, is a fact-intensive inquiry best determined by the trier of fact.

---

[2]The 1964 Act required twenty-five employees for twenty weeks in any current or preceding calendar year. A 1972 amendment changed the requirement to fifteen employees. 1972 Amendments, Pub. L. No. 92–261, § 2(2), 86 Stat. 103, 103 (1972).

Our analytical approach to subject-matter jurisdiction mirrors the *Arbaugh* analysis:

> [J]urisdiction of the subject matter is conferred by operation of law, and not by act of the parties or by procedure of the court. It cannot be ousted by act of the parties, if it exists, nor conferred by such acts, if it does not exist. Its existence antedates the particular litigation, and is not conferred by the litigation or by its procedure.

*Pottawattamie Cty. Dep't of Soc. Servs. v. Landau*, 210 N.W.2d 837, 843 (Iowa 1973) (alteration in original) (quoting *Appeal of McLain*, 189 Iowa 264, 269, 176 N.W. 817, 819 (1920)). The ICRA "provides a cause of action for discriminatory practices" and "gives the district court subject matter jurisdiction of such actions." *Christie*, 448 N.W.2d at 450. Subject-matter jurisdiction "cannot be conferred by consent, waiver, or estoppel." *Duckett*, 732 N.W.2d 874 (quoting *Keokuk County v. H.B.*, 593 N.W.2d 118, 122 (Iowa 1999)). If numerosity were jurisdictional, a party could raise it after trial to vacate a judgment, resulting in a waste of resources. *See In re Estate of Falck*, 672 N.W.2d 785, 789 (Iowa 2003) (noting lack of subject-matter jurisdiction makes the judgment void). The better interpretation is that the numerosity requirement of section 216.6(6)(*a*) is part of the plaintiff's substantive burden of proof. If the defendant does not contest numerosity, "the judgment becomes final and is not subject to collateral attack." *Id.* at 790.

2. *Did the agency correctly interpret the term "regularly employs"?* Simon Seeding urges us to follow *Cochran v. Seniors Only Financial, Inc.*, which interpreted the ICRA's numerosity requirement. 209 F. Supp. 2d 963, 967 (S.D. Iowa 2002). Janet Cochran alleged a hostile work environment and sex discrimination in violation of the ICRA. *Id.* at 964. The defendant filed a motion for partial summary judgment on the ground it employed less than four individuals. *Id.* The *Cochran* court

noted, "Iowa Code section 216.6(6)(*a*) has not been heavily inspected by the courts." *Id.* at 967. The court observed that although federal law "is not controlling of ICRA claims," it can provide "the analytical framework." *Id.* at 966 (quoting *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999)). Title VII's numerosity requirement defines the term "employer" to include only those having "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year." 42 U.S.C. § 2000e(b).

The *Cochran* court concluded it was appropriate to rely on federal authorities for guidance to interpret section 216.6(6):

> In *Vivian,* the Iowa Supreme Court found some stark differences in the language the Iowa legislators [chose] to use, and found that federal law was not persuasive and a supervisor could be held personally liable under the ICRA. In this case, the Court does not find these same differences in the relevant statutory language when comparing the ICRA to Title VII. While the ICRA states that for an employee to count he or she must be "regularly" employed, Title VII goes a step farther and says that an employee must be employed "for each working day in each of 20 or more calendar weeks in the current or preceding calendar year" in order for the employee to count towards the numerosity requirement. The Court finds that Title VII does provide appropriate guidance for determining whether an employee is "regularly" employed under the ICRA and adopts this definition.

209 F. Supp. 2d at 967 (quoting 42 U.S.C. § 2000e(b)). The court concluded each employee "must have been employed for twenty weeks in order to have been 'regularly employed' " under the ICRA. *Id.* Under that definition, the employer "regularly employed only two employees during the relevant time frame." *Id.* Therefore, the court granted summary judgment for the employer. *Id.*

Simon Seeding argues we should follow *Cochran* to count only individuals it had employed for at least twenty weeks. The *Cochran* court, however, used a twenty-week requirement nowhere codified in the

ICRA. Moreover, *Cochran* is contrary to the great weight of federal authority as well as state court numerosity decisions. We decline to follow it.[3]

The DHRC relies on *Walters v. Metropolitan Educational Enterprises, Inc.,* a United States Supreme Court case clarifying how to count employees under Title VII. 519 U.S. 202, 207, 117 S. Ct. 660, 664 (1997). Darlene Walters filed a complaint with the Equal Employment Opportunity Commission (EEOC), "claiming that Metropolitan had discriminated against her on account of her sex in failing to promote her." *Id.* at 204, 117 S. Ct. at 662. Metropolitan filed a motion to dismiss on grounds that it "did not pass the 15-employee threshold for coverage under Title VII." *Id.* The district court granted the motion, reasoning that employees only counted toward the fifteen-person requirement on days "which they actually performed work or were being compensated." *Id.* at 205, 117 S. Ct. at 663. The court of appeals affirmed, and the Supreme Court granted certiorari to explain *how and when* persons are counted as employees. *Id.*

The *Walters* Court stated that "an employer 'has' an employee if he maintains an employment relationship with that individual." *Id.* at 207, 117 S. Ct. at 664. To determine whether an employment relationship

---

[3]No federal appellate court has adopted the *Cochran* approach urged by Simon Seeding—that an *employee* must work for twenty weeks before counting toward the threshold employee requirement. *See Cochran*, 209 F. Supp. 2d at 967. A federal district court, interpreting a similar numerosity requirement under the Age Discrimination in Employment Act, observed,

> All that the statute requires is that the employer have 20 or more employees for each day of 20 or more calendar weeks. It does not require that a particular individual be employed for 20 weeks prior to being counted as an employee.

*Rogers v. Sugar Tree Prods., Inc.,* 824 F. Supp. 755, 761 (N.D. Ill. 1992), *aff'd* 7 F.3d 577 (7th Cir. 1993).

exists, courts should look "first and primarily to whether the individual in question appears on the employer's payroll." *Id.* at 211, 117 S. Ct. at 666.

> [A]ll one needs to know about a given employee for a given year is whether the employee started or ended employment during that year and, if so, when. He is counted as an employee for each working day after arrival and before departure.

*Id.* at 211, 117 S. Ct. at 665–66. "Metropolitan had between 15 and 17 employees on its payroll" for thirty-eight weeks out of the year. *Id.* at 205, 212, 117 S. Ct. at 663, 666. Therefore, Metropolitan met the fifteen-employee threshold and was subject to the provisions of Title VII. *Id.* at 212, 117 S. Ct. at 666.

*Walters* resolved a circuit split among federal circuits over how to count employees to meet Title VII's numerosity requirement. 519 U.S. at 205–07, 117 S. Ct. at 662–64. The United States Court of Appeals for the Seventh and Eighth Circuits had counted employees for a particular working day only when the employer was "actually compensating the individual on that day." *Id.* at 206, 117 S. Ct. at 663; *see also E.E.O.C. v. Garden & Assocs., Ltd.*, 956 F.2d 842, 843 (8th Cir. 1992), *abrogated by Walters*, 519 U.S. at 206, 212, 117 S. Ct. at 663, 666; *Zimmerman v. N. Am. Signal Co.*, 704 F.2d 347, 354 (7th Cir. 1983), *abrogated by Walters*, 519 U.S. at 206, 212, 117 S. Ct. at 663, 666. This interpretation excluded many part-time workers who did not work each day and thus were not considered "employees" for that week and excluded employees who left or began work mid-week. *Garden & Assocs.*, 956 F.2d at 843 (part-time employees); *E.E.O.C. v. Metro. Educ. Enters., Inc.*, 60 F.3d 1225, 1228 (7th Cir. 1995) (counting employees who exit or enter mid-

week is a "highly unlikely reading of the statute"), *rev'd sub nom. Walters*, 519 U.S. at 212, 117 S. Ct. at 666.

On the other side of the circuit split, in *Thurber v. Jack Reilly's, Inc.*, the First Circuit adopted a broader payroll approach based on Title VII's legislative history. 717 F.2d 633, 634 (1st Cir. 1983). "Congressional debate on enactment of Title VII revealed concern for the over-regulation of small family or neighborhood businesses." *Id.* "The number 15 was a compromise figure," but there was "nothing in the record to indicate a Congressional intent to require that employees report to work on each day that they are included." *Id.* at 635. The court recognized that Title VII was a "remedial statute, and the prevailing majority in Congress intended to give it broad effect." *Id.* The court stated,

> It is true that the interpretation given to the statute by the district court might sweep into the ambit of the statute a few truly "Mom and Pop" stores, which employ a large number of part-time employees in order to keep open long hours. The burden on such businesses, however, is the relatively modest one of forbearance from discrimination in employment. In our opinion, the inclusion of such stores offends less against the policy of the statute than does the exclusion of businesses such as the appellant.

*Id.* " '[T]he term "employer" [was] intended to have its common dictionary meaning,' and that employers with part-time or seasonal staffs were intended to be covered by the act 'when the number of employees exceeds the minimum figure.' " *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F. Supp. 936, 941 (D. Colo. 1979) (quoting 110 Cong. Rec. 7216–7217 (daily ed. Apr. 8, 1964)); *see also* David A. Forkner & Kent M. Kostka, *Unanimously Weaving a Tangled Web:* Walters*, Robinson*, Title VII, and the Need for Holistic Statutory Interpretation*, 36 Harv. J. on Legis. 161, 170 (1999) (detailing comments of Senator

Dirksen, the author of the amendment that coined the "employer" definition, stating purpose of twenty-week requirement was to reach seasonal workers).

The *Cochran* approach we reject would allow savvy employers to structure their workforce to avoid compliance obligations. An employer could "keep[] its staffing levels above the threshold on most working days, and allow[] it to fall under the level on just one work day." *Wright v. Kosciusko Med. Clinic, Inc.*, 791 F. Supp. 1327, 1332 (N.D. Ind. 1992). The *Thurber* approach counted an employee toward the threshold on each day an employment relationship existed, as evidenced by payroll records, regardless of whether the employee reported to work. 717 F.2d at 634. The *Walters* Court found this more expansive payroll method persuasive and adopted it as the federal standard. 519 U.S. at 210–11, 117 S. Ct. at 665–66. We agree with the DHRC that the *Walters* payroll approach should be used to count employees for the ICRA and Dubuque small-employer exemption, without regard to the number of weeks individual employees worked.

In the absence of a legislative definition, we strive to give words their ordinary meaning. *City of Riverdale v. Diercks*, 806 N.W.2d 643, 655–56 (Iowa 2011). "The primary purpose of statutory construction is to determine legislative intent," gleaned from the words used by the legislature. *State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000). "[W]e read statutes as a whole rather than looking at words and phrases in isolation"; context is important. *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015). "We 'look to the object to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.' " *Renda*, 784 N.W.2d at 15

(quoting *Sommers v. Iowa Civil Rights Comm'n*, 337 N.W.2d 470, 473 (Iowa 1983)).

In *Baker*, we discussed the purpose of the small-employer exemption. 750 N.W.2d at 101. John Baker owned a home in Iowa City and employed a resident manager to run the property while he lived out of state. *Id.* at 95. Baker allegedly discriminated against a female applicant for the position. *Id.* An Iowa City civil rights ordinance applied by its terms to employers with "one or more" employees. *Id.* at 100 (quoting Iowa City, Iowa, City Code § 2–3–1 (2003)). We held the city ordinance could not expand the coverage of the Iowa Civil Rights Act and thereby nullify the ICRA's small-business exemption. *Id.* at 101–02.

We recognized that the small-employer exemption was enacted as a result of "changes advocated in a 1964 law review article" by Professor Arthur Bonfield. *Id.* at 101. Bonfield "urged enactment of an employment discrimination statute that included a small-employer exemption." *Id.* (citing Arthur E. Bonfield, *State Civil Rights Statutes: Some Proposals*, 49 Iowa L. Rev. 1067, 1108 (1964) [hereinafter *State Civil Rights Statutes*]).

> Almost all fair employment practices acts exempt small employers, which are defined as employers with less than a specified number of employees. The general consensus seems to be that notions of freedom of association should preponderate over concepts of equal opportunity in these situations because the smallness of the employer's staff is usually likely to mean for him a rather close, intimate, personal, and constant association with his employees.

*Id.* (quoting *State Civil Rights Statutes*, 49 Iowa L. Rev. at 1109)). Accordingly, in *Baker*, we interpreted the ICRA to "protect small employers' associational interests." *Id.* We concluded "the legislature made the policy decision that 'freedom of association should preponderate over concepts of equal opportunity' in situations involving

small employers." *Id.* (quoting *State Civil Rights Statutes*, 49 Iowa L. Rev. at 1109).

We also apply the legislative directive to "construe[ the ICRA] broadly to effectuate its purposes." Iowa Code § 216.18(1); *accord* Dubuque, Iowa, Code of Ordinances § 8-4-10 (codifying same rule of construction). The ICRA was enacted "to eliminate unfair and discriminatory practices in . . . employment" and "correct a broad pattern of behavior rather than merely affording a procedure to settle a specific dispute." *Renda*, 784 N.W.2d at 19 (alteration in original) (first quoting 1965 Iowa Acts ch. 121 (title of act), then quoting *Estabrook v. Iowa Civil Rights Comm'n*, 283 N.W.2d 306, 308 (Iowa 1979)). We strive to effectuate these purposes as we define the phrase "regularly employs less than four individuals."

The dictionary defines "regularly" as "in a regular, orderly, lawful or methodical way." *Regularly, Webster's Third New International Dictionary* (unabr. ed. 2002). "Regular," is defined as "returning, recurring, or received at stated, fixed, or uniform intervals." *Regular, Webster's Third New International Dictionary.* We construed "employ" in the Iowa wage payment collection law to mean,

> To engage in one's service; to hire, to use as an agent or substitute in transacting business; to commission and intrust with the performance of certain acts or functions or with the management of one's affairs; . . . the term is equivalent to hiring, which implies a request *and a contract for compensation.* To make use of, to keep at work, to entrust with some duty.

*Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 585 (Iowa 2002) (alteration in original) (emphasis added) (quoting *Employ, Black's Law Dictionary* (abr. 6th ed. 1991)); *see also Employ, Webster's Third New International Dictionary* (defining "employ" as "to provide with a job that

pays wages or a salary or with a means of earning a living"). Thus, the word "employ" focuses on the existence of a contract for services, and the word "regular" focuses on recurring acts.

We must interpret words in context. The phrase "regularly employs" modifies "employer," not employee. Iowa Code § 216.6(6)(*a*) ("Any *employer* who *regularly employs*" (emphasis added)). The exemption could have been drafted to say, "Any *employee* who is regularly *employed*." For example, Connecticut's workers' compensation statute defines an employee as excluding a person engaged in service in a private dwelling "provided he is not *regularly employed* by the owner or occupier over twenty-six hours per week." Conn. Gen. Stat. Ann. § 31-275(9)(A)(vi) (West, Westlaw current through General Statutes of Conn., Revision of 1958, Revised to Jan. 1, 2017). This was interpreted to mean the "person must work more than twenty-six hours per week during the majority of the fifty-two weeks preceding the date of his or her injury." *Smith v. Yurkovsky*, 830 A.2d 743, 746 (Conn. 2003); *see also* La. Stat. Ann. § 47:111(A)(3)(*a*) (Westlaw current through 2017 1st Extraordinary Sess.) (defining "regularly employed" as a person who performs services over a set period of twenty-four days per calendar quarter). Simon Seeding's interpretation would make more sense under those statutes.

By contrast, the Iowa legislature chose to define the small-employer exemption by focusing on the actions of the employer rather than the individual employee. We are bound by the language our legislature selected. Iowa Code section 216.6(6)(*a*) exempts *employers* who regularly employ less than four individuals.

Our interpretation is supported by the numerosity decisions of other state appellate courts construing equivalent small-employer exemptions. For example, the California Fair Employment and Housing

Act defines an "employer" as "any person regularly employing five or more persons." Cal. Gov't Code § 12926(d) (West, Westlaw current through ch. 8 of 2017 Reg. Sess.). In *Robinson v. Fair Employment & Housing Commission*, the California Supreme Court interpreted the term "regularly employing" under the Act. 825 P.2d 767, 768 (Cal. 1992). The *Robinson* court gave those words their ordinary meaning, stating,

> The California act states that an employer falls within its provisions only when he is *regularly* employing five or more persons. This does not mean that the accused employer must have five or more employees every day throughout the year or that he must have five or more employees at the time of the discriminatory act. It does mean that he must have an "average" or "normal" complement of five or more persons in his employ on a "regular" basis.

*Id.* at 773 (quoting Michael C. Tobriner, *California FEPC*, 16 Hastings L.J. 333, 343 (1965) [hereinafter Tobriner]). The court determined the purpose of the Act was to

> reliev[e] the administrative body of the burden of enforcement [of the Act] where few job opportunities are available, and [to] keep[] the agency out of situations in which discrimination is too subtle or too personal to make effective solutions possible.

*Id.* at 774. As we did in *Baker*, the California Supreme Court noted the legislature's policy choice to favor the associational rights of small employers:

> A sense of justice and propriety led the framers to believe that individuals should be allowed to retain some small measure of the so-called freedom to discriminate; besides, they feared the political repercussions of eliminating totally an area of free choice whose infringement had been so bitterly opposed. In the second place, the framers believed that discrimination on a small scale would prove exceedingly difficult to detect and police. Third, it was believed that an employment situation in which there were less than five employees might involve a close personal relationship between employer and employees and that fair employment laws should not apply where such a relationship existed.

> Finally, the framers were interested primarily in attacking protracted, large-scale discrimination by important employers and strong unions. Their aim was not so much to redress each discrete instance of individual discrimination as to eliminate the egregious and continued discriminatory practices of economically powerful organizations. Thus they could afford to exempt the small employer.

*Id.* at 775 (quoting Tobriner, 16 Hastings L.J. at 342). The *Robinson* court concluded the word "regularly" suggested an understanding of "occurring at fixed intervals." *Id.* Thus, "the number of employees who work regularly as opposed to intermittently, or who are carried on the payroll at the time of the discriminatory act, would be dispositive." *Id.*

Similarly, North Carolina's Equal Employment Practices Act applies to employers that "regularly employ 15 or more employees." *See* N.C. Gen. Stat. Ann. § 143-422.2 (West, Westlaw effective through S.L. 2017-9, 2017 Reg. Sess.). Interpreting this phrase, the North Carolina Court of Appeals found the federal "payroll method" persuasive:

> "The ultimate purpose of . . . [N.C. Gen. Stat. §] 143–422.2, and Title VII . . . is the same; that is, the elimination of discriminatory practices in employment." Accordingly, we find the language of Title VII, and the principles of law applied to claims arising under Title VII, to be instructive here. We conclude that an employer regularly employs 15 or more employees, and is thus governed by N.C. Gen. Stat. § 143–422.2, when 15 or more employees appear on the employer's payroll each working day during each of 20 or more calendar work weeks in the current or preceding calendar year.

*Walker v. Town of Stoneville*, 712 S.E.2d 239, 248 (N.C. Ct. App. 2011) (alterations in original) (quoting *N.C. Dep't of Corr. v. Gibson,* 301 S.E.2d 78, 85 (N.C. 1983)).

Under Simon Seeding's interpretation, an employer could employ 100 individuals for nineteen weeks, terminate their employment, then hire 100 different individuals for the next nineteen weeks, and so on. The employer would thereby escape the purview of the Act because at no

point would it have employed the same four or more individuals for twenty consecutive weeks.  Given that section 216.6(6)(*a*) was intended to exempt only *small* employers, we refuse to open that loophole in the ICRA.  We instead adopt the *Walters* approach to hold that an employee is counted for purposes of the small-business exemption if that employee has an employment relationship with the employer—that is, if he or she is on the payroll.

We decline to import a twenty-week requirement into the ICRA.  Title VII expressly codifies a twenty-week requirement.  *See* 42 U.S.C. § 2000e(b) (defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year").  Title VII was enacted with the twenty-calendar week requirement in 1964.  *See* Civil Rights Act of 1964, Pub. L. No. 88–190, § 701, 78 Stat. 241, 253.  The Iowa legislature declined to include a twenty-week term when it enacted the ICRA a year later.  *See* 1965 Iowa Acts ch. 121, § 7.  We will not add a requirement to a statute that the legislature chose to omit.  *See Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d 199, 210 (Iowa 2014) ("[L]egislative intent is expressed by what the legislature has said, not what it could or might have said. . . .  Intent may be expressed by the omission, as well as the inclusion, of statutory terms." (quoting *State v. Beach*, 630 N.W.2d 598, 600 (Iowa 2001))).  The ICRA's requirement that an employer "regularly employ" four or more employees does not include a requirement the employer must do so for twenty weeks.

Nonetheless, we must give effect to the word "regularly" as used in the small-business exemption.  Our statute is unlike Ohio's in which the numerosity requirement merely states "any person employing four or

more persons within the state." Ohio Rev. Code Ann. § 4112.01 (West, Westlaw current through 2017 File 4). Such a statute would not require a minimum period during which the requisite number must be employed and could be interpreted to apply if the employer merely had four employees at the time of the discrimination. *See Cisneros v. Birck,* No. 94APE08–1255, 1995 WL 222156, at *5 (Ohio Ct. App. Apr. 11, 1995) ("The statute does not say that an employer is any person who employed four people during any period of time whatsoever. . . . [I]t is apparent that the legislature meant that the employer must have at least four employees at the time the discrimination occurred."). But "we must 'give effect, if possible, to every clause and word of a statute.'" *TLC Home Health Care, L.L.C. v. Iowa Dep't of Human Servs.,* 638 N.W.2d 708, 713 (Iowa 2002) (quoting *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S. Ct. 513, 520 (1955)).

At the time of the ICRA's enactment, the workers' compensation laws in many states applied to employers who "regularly employed" the requisite number of individuals. In *Mobile Liners, Inc. v. McConnell,* the Alabama Supreme Court adjudicated whether a steamboat company "regularly employ[ed]" less than sixteen employees under that state's act. 126 So. 626, 627 (Ala. 1930). The employer continuously employed nine people to do office work, but employed many more as checkers when steamboats came into port. *Id.* at 628. "These checkers were not employed every day, but were employed for each vessel when it was in port," and the arrival of the vessels occurred at regular intervals. *Id.* The court determined the employer "regularly" employed more than sixteen individuals, despite the intermittent nature of the work. *Id.* at 631. The *McConnell* court stated,

> The word "regularly" is not synonymous with "constancy." There are businesses of importance which employ numbers of men *regularly*, who employ none of them *continuously*. And a number of businesses, as this, will require a large number of employees, nearly all or a large number of whom are employed only *periodically*, for the reason that the needs of the business require their services only at intervals or periods, whenever the business is in active operation. We may illustrate by amusement parks, theaters, places of entertainment, building or construction contractors who have or may have many men working for them, and yet fall within the class of those who cannot foretell the number of workmen they will have or need on the first of the next month or a given, designated date.

*Id.* at 629. The proper focus was on the employer and "whether the *occurrence is or is not an established mode or plan in the operation of the business.*" *Id.* at 630. In other words, if the employer's typical method of transacting business involved the work of the requisite number of employees, then the employer was covered by the Act. *See id.* Many other courts had taken the same approach at the time the ICRA was enacted.[4]

---

[4]The Arizona Supreme Court observed, "[W]here in the ordinary conduct of an employer's business he customarily or regularly employs the number required to make the act applicable to him . . . he is within the provisions of the [Workers' Compensation] Act." *Marshall v. Indus. Comm'n*, 156 P.2d 729, 732 (Ariz. 1945) (collecting cases); *see also Grant v. Alaska Indus. Bd.*, 11 Alaska 355, 361 (D. Ct. 1947) ("[W]hen the statutory number of persons is employed most of the time so that it can be said to be the rule rather than the exception; or where . . . the event or condition requiring their employment is a regularly recurring one in the ordinary course of the business, the employer is within the Act." (Citation omitted.)); *Wallace v. Wells*, 255 S.W.2d 970, 973 (Ark. 1953) (noting employer "had five men regularly employed, although some of them worked only two days a week"); *France v. Munson*, 3 A.2d 78, 81 (Conn. 1938) ("The word 'regularly' implies a practice [of employment] . . . ."); *Mathers v. Sellers*, 113 So. 2d 443, 444 (Fla. Dist. Ct. App. 1959) ("It is also the general rule that coverage is imposed where there is uniformity of practice in the particular business of the employer and the requisite number of employees are employed . . . ."); *McDonald v. Seay*, 8 S.E.2d 796, 797 (Ga. Ct. App. 1940) (concluding employer within purview of Act when "employer . . . testified that it was his custom or plan of operation to work as many as twelve men thirty per cent. [sic] of the time"); *Fowler v. Baalmann, Inc.*, 234 S.W.2d 11, 14 (Mo. 1950) (en banc) ("And 'regularly' as used in the statute 'refers to the question whether the occurrence is or is not in an established mode or plan in the operation of the business, and has no reference to the constancy of the occurrence.'" (quoting *McDonald*, 8 S.E.2d at 797)); *Adams v. Ross*, 243 N.Y.S. 464, 467 (App. Div. 1930)

"The number of persons used to carry out the established mode of performing the work of the business is determinative even though the work may be recurrent instead of constant." *Cotman v. Green*, 356 S.E.2d 447, 448 (Va. Ct. App. 1987). "The term does not mean constant employment of the requisite number of persons, but rather is a function of the frequency, regularity, and duration of the occurrences in which that number is employed." *LaPoint v. Barton*, 328 So. 2d 605, 607 (Ala. Civ. App. 1976). As the Arizona Supreme Court noted, "The soft drink business itself is a good example. During the summer months, an employer may have a large number or employees, and during the winter have comparatively few." *Marshall v. Indus. Comm'n*, 156 P.2d 729, 731 (Ariz. 1945). If the character of the business is such that it is seasonal— but recurring—in nature, a business that employs over the requisite number during the season "regularly employs" them under the Act. *See id.*; *see also Agee v. Indus. Comm'n*, 455 P.2d 288, 291 (Ariz. Ct. App. 1969) ("If the employer has a seasonal business and operates only three months out of the year and during that three-month period has three or more employees he must be insured."); *Chaney v. Indus. Comm'n*, 207

_____

(per curiam) ("We hold that it is not necessary that four men should be employed during the entire year, but it is sufficient if such employment continues through a reasonably definite period of time, and is not casual."); *Hunter v. Peirson*, 49 S.E.2d 653, 654 (N.C. 1948) ("If the work pertains to the business of the employer and is within the general scope of its purpose, the employment is not of a casual nature, although the hiring be for only a short period of time." (quoting *Johnson v. Asheville Hosiery Co.*, 153 S.E. 591, 593 (N.C. 1930)); *La Croix v. Frechette*, 145 A. 314, 315 (R.I. 1929) ("The word 'regularly' in the act connotes some uniformity in the practice of the employment of more than five men."); *Cauchon v. Gladstone*, 160 A. 254, 257 (Vt. 1932) ("We think that, in view of the fact that a helper had been employed for three months, . . . together with the tendency of the evidence showing the necessity for such a helper," employer regularly employed requisite number under the Act.); Annotation, *Workmen's Compensation: Continuity and Duration of Employment Required by Provisions of Act Making Its Applicability Depend on Number of Persons Employed*, 81 A.L.R. 1232 (originally published in 1932) (Westlaw current through Apr. 27, 2017).

P.2d 816, 817–18 (Colo. 1949) (holding poultry business regularly employed requisite number when business was seasonal and operated primarily in summer); *Hunter v. Peirson*, 49 S.E.2d 653, 654 (N.C. 1948) (concluding fertilizer delivery service "regularly employed" five or more during two-month fertilizer season); *Grouse v. DRB Baseball Mgmt., Inc.*, 465 S.E.2d 568, 570–71 (N.C. Ct. App. 1996) (holding that baseball company, although seasonal, "regularly employed" four or more employees during season). On the other hand, infrequent or unpredictable hiring does not constitute regular employment. *Putz v. Indus. Comm'n*, 51 P.3d 979, 983 (Ariz. Ct. App. 2002).

Courts construe numerosity requirements to avoid the "adverse effects from unusual, temporary conditions." *Cotman*, 356 S.E.2d at 448.

> If applicability of the Act was influenced by transient factors, an employer's status could fluctuate between being subject to the Act and exempt from the Act. Such instability would be unsettling for both employer and employees. If an employer regularly employs [the requisite number] to carry out the established mode of performing the work of the business, he should remain subject to the provisions of the Act even if one or more of the employees works less than full-time, or if the number of his employees temporarily falls below [the requisite number.]"

*Id.* at 448–49. In this way, an employer does not "oscillate between coverage and exemption as its labor force exceeds or falls below the minimum from day to day." *Hernandez-Zuniga v. Tickle*, 647 S.E.2d 691, 696 (S.C. Ct. App. 2007) (quoting 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* §§ 74.01–.02 (2000)).

We assume "when a legislature enacts statutes it is aware of the state of the law." *Rhoades v. State*, 880 N.W.2d 431, 446 (Iowa 2016). By using the same phrase, "regularly employs" found in many employment-related laws in other states, we assume the Iowa legislature

likewise expected the phrase to be construed to avoid day-to-day changes in the Act's applicability to particular employers. If a seasonal business has four or more employees on the payroll during its season, then the employer is subject to the requirements of the ICRA. *See Mobile Liners*, 126 So. at 630 (focusing on "whether the *occurrence* [of requisite number of employees] *is or is not an established mode or plan in the operation of the business*"). We hold Simon Seeding is subject to the Dubuque ordinance if it had four or more employees on its payroll (not counting its owner) during the landscaping season.

3. *Was there substantial evidence supporting the agency's determination that Simon Seeding regularly employs four or more individuals?* Simon Seeding argues even under the DHRC's interpretation, there was insufficient evidence that it regularly employed four or more individuals. The agency's factual findings must be supported by "substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(*f*). Substantial evidence

> means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(*f*)(10)(1).

We conclude there is substantial evidence in the record to support the DHRC's determination that Simon Seeding regularly employed four or more individuals during the landscaping season in 2012. Simon Seeding's payroll records show it employed four or more individuals (not including Leo Simon) for nineteen weeks during March to September 2012. Leo admitted some individuals who he employed were not

included on the payroll records. Notably, neither Stapleton nor Jody James appear on its payroll records, although it is undisputed they were employed by Simon Seeding during that time.

The DHRC properly relied on an adverse inference from Simon Seeding's failure to produce complete payroll records.

> It is a well established legal principle that . . . the failure to produce documents or physical evidence relevant to the proof of an issue in a legal proceeding supports an inference that the evidence would have been unfavorable to the party responsible for its . . . nonproduction.

*Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001). "When established, the inference is regarded as an admission by conduct of the weakness of the party's case." *Id.* We allow an adverse inference for both evidentiary and punitive reasons. *Id.* The inference can be used upon a showing the party intentionally withheld evidence within its control. *Id.* at 719.

The adverse inference should be utilized "prudently and sparingly." *Lynch v. Saddler*, 656 N.W.2d 104, 111 (Iowa 2003) (quoting *Phillips*, 625 N.W.2d at 720). We have refused to allow an adverse inference in cases in which it was "not clear" whether a party intentionally destroyed or withheld evidence. *Id.*; *see also Phillips*, 625 N.W.2d at 719 (refusing to allow adverse inference based on "bare speculation and conjecture" that failure to produce record was intentional). But the record supports the finding that Leo Simon intentionally failed to maintain proper payroll records and intentionally withheld records during the DHRC investigation. The DHRC sent Leo eight letters requesting information, including payroll documents, during its lengthy investigation. The DHRC subpoenaed payroll records, and Leo still did not respond for months. It was only in February 2014, twenty months after the first letter, that Leo

finally gave the DHRC the name of his accountant. Upon receiving the files from her, the DHRC discovered that Leo only listed four employees on his payroll. Leo said he did not keep records for other individuals Simon Seeding admittedly employed. The panel and district court correctly applied the adverse inference. A party cannot escape the purview of the ICRA or the Dubuque ordinance by failing to keep proper payroll records or by stonewalling agency investigators. We conclude that substantial evidence supports the DHRC's finding that Simon Seeding regularly employed four or more individuals during the landscaping season in 2012.

**B. Whether There Is Substantial Evidence to Support the Agency's Findings.** Simon Seeding argues the agency's findings on liability and damages are not supported by substantial evidence. We disagree. "In a substantial-evidence challenge to agency fact-findings, the court must consider 'any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses.'" *Christiansen v. Iowa Bd. of Educ. Exam'rs*, 831 N.W.2d 179, 192 (Iowa 2013) (quoting Iowa Code § 17A.19(10)(*f*)). "The law is well-settled. It is the agency's duty 'as the trier of fact to determine the credibility of the witnesses, weigh the evidence, and decide the facts in issue.'" *Id.* (quoting *Arndt v. City of Le Claire*, 728 N.W.2d 389, 394–95 (Iowa 2007)). The DHRC and the panel hearing the live testimony credited Stapleton's testimony and the testimony of his witnesses and found that Leo Simon was not credible.

1. *Sufficiency of the evidence for hostile work environment.* "Hostile work environment claims are actionable '[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." ' " *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 743 (Iowa 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)). It "recognizes workplace discrimination affects the full spectrum of disparate treatment in the workplace and targets discrimination that requires employees to work in a discriminatorily abusive or hostile workplace." *Id.* Hostile work environment claims can be based on racial harassment.

The DHRC found Leo Simon, a supervisor, harassed Stapleton. To establish a hostile work environment in such circumstances, the employee must show "(1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment." *Id.* at 744. It is undisputed that Stapleton belonged to a protected group, that the harassment he suffered was unwelcome, and that the harassment was based on Stapleton's race.

Simon Seeding argues the harassment was not "sufficiently severe or pervasive to alter the conditions of . . . employment." *Id.* (quoting *Harris*, 510 U.S. at 21, 114 S. Ct. at 370). The employee must prove he or she "subjectively perceived the conduct as abusive" and that "a reasonable person would also find the conduct to be abusive or hostile." *Id.*

> The objective determination considers all of the circumstances, including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance. These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or

conditions of employment. Thus, hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events.

*Id.* at 744–45 (citations omitted).

In *Farmland Foods, Inc.*, we evaluated a hostile work environment racial discrimination claim by an employee who claimed his employer was overly critical of his work and assigned him unfavorable jobs because of his race. 672 N.W.2d at 738–39. Samuel Taylor worked at a meat-packing plant in Dubuque, and alleged his supervisor, Dick Sherman, discriminated against him by reprimanding him for failing to keep up with production standards and assigning him to an undesirable position. *Id.* The DHRC determined that Taylor established a hostile work environment claim and awarded damages. *Id.* at 740. The district court reversed, finding no substantial evidence the conduct was racially motivated. *Id.* We held there was insufficient evidence to support the hostile work environment claim. *Id.* at 746. We recognized that "[t]he use of racial epithets may not only support an inference of discrimination based on race, but may also support an inference that racial animus motivated the other conduct." *Id.* at 745. But we noted the absence of such epithets in that record:

> We acknowledge Taylor felt Sherman picked on him from time to time and that his feelings were generally confirmed by the beliefs of some of his coworkers. However, there is no evidence that Sherman or any other supervisor ever used any racially derogatory language and the conduct used to support the claim was neither severe nor pervasive.

*Id.* at 746. We held that "occasional criticism of an employee's work performance by a supervisor, absent references or another nexus to race or national origin, does not amount to racial harassment." *Id.* at 745.

By contrast, Leo regularly referred to Stapleton using racial epithets, including calling him "chocolate." *See Martin v. Merck & Co.,*

446 F. Supp. 2d 615, 628 (W.D. Va. 2006) ("The use or reference to chocolate can indisputably be a racial slur, and thus I find that a reasonable inference of racial animus can be inferred from the fact that chocolate was smeared on Martins' clothing."); *Purnell v. Maryland*, 330 F. Supp. 2d 551, 561 (D. Md. 2004) (finding "chocolate bunny" joke showed racial animus); *Boggs v. Die Fliedermaus, LLP*, 286 F. Supp. 2d 291, 295, 298 (S.D.N.Y. 2003) (concluding that reasonable jury could find remark that it was a " 'chocolate night' at Le Bar Bat and refer[ring] to the three [plaintiffs] as dark, light, and semisweet chocolate" created a racially hostile environment). Leo admitted to occasionally referring to Stapleton by these terms, although he testified he did not mean them to be derogatory. But "racially offensive remarks are not excused if they are made in a joking manner." *Boggs*, 286 F. Supp. 2d at 298. Stapleton testified that about "ninety percent" of the time he asked Leo to stop referring to him in that way, yet Leo persisted.

" 'A hostile work environment is a cumulative phenomenon,' and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010) (quoting *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1124 (8th Cir. 2007)). The " 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' does not affect the terms, conditions or privileges of employment to a significant degree." *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 633 (Iowa 1990) (quoting *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971), *overruled on other grounds by E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 62 n.11, 104 S. Ct. 1621, 1628 n.11 (1984)). A few isolated or sporadic racial remarks over a long period of time, or heard secondhand, may not be enough to establish racial discrimination. *See*

*Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (holding insufficiently severe or pervasive conduct when employee heard that coworkers and managers referred to him with racial slur); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (affirming judgment as a matter of law for defendant when African-American referred to as a "black boy" on a few occasions over several years). But repeated harassing remarks may be sufficient to establish hostile working environment. *See Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 379 (Iowa 1986) (concluding racially hostile environment existed when employees repeatedly referred to employee as "Toby," a character who portrayed a slave in the story "Roots," and harassed him with racist drawings); *see also Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 864 (8th Cir. 2010) (finding sufficient evidence when employee repeatedly subjected to comments about race and gorilla gestures during two-month period). Stapleton testified Leo called him racial epithets two to three times a week over the two-month period he worked for Simon Seeding. We conclude the evidence was sufficient to support the DHRC's finding that the conduct was severe enough to alter the terms or conditions of Stapleton's employment.

Simon Seeding argues there was insufficient evidence to support a racially hostile work environment because much of the evidence supporting the claim came from Stapleton himself, or his mother and ex-girlfriend. Under Iowa Code section 17A.14,

> [a] finding shall be based upon the kind of evidence on which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs, and may be based upon such evidence even if it would be inadmissible in a jury trial.

Iowa Code § 17A.14(1). Under this provision, hearsay evidence is admissible. *Clark v. Iowa Dep't of Revenue & Fin.*, 644 N.W.2d 310, 320 (Iowa 2002). Stapleton told both his mother and ex-girlfriend of the harassing treatment as it was occurring in March through May of 2012. Moreover, other evidence supports Stapleton's claims. Huinker's contemporaneous report of his conversations with Leo corroborates part of Stapleton's account of the events of May 6. Another resident complained that Leo referred to him with a racist remark. Leo admitted to using the remarks on a few occasions. The DHRC properly considered such evidence to find there was a racially hostile work environment.

2. *Sufficiency of the evidence for award of lost wages.* Stapleton next argues there was insufficient evidence to support the award for lost wages. "[W]e first acknowledge that the calculation of front pay and back pay is 'a judgment call within the province of the commission and not the court.'" *Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 513 (Iowa 2004) (quoting *Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 531 (Iowa 1990)). "[A]bsolute precision in proving what an employee would have earned but for the employer's discrimination is not required." *Id.* at 514.

The DHRC awarded Stapleton $4500 in lost wages, calculated as follows: Simon Seeding paid Stapleton $8 per hour, and Stapleton worked 138 hours from March 15 until May 6. This equals an average of twenty hours per week, earning a weekly average of $160. The DHRC found Stapleton lost 262 days of work, or 37.43 weeks. This amounted to $7817 in lost wages. However, the DHRC reduced that amount based on Stapleton's employment at Roofco. We conclude the DHRC correctly applied the law governing the proof and measurement of lost wages. *See id.* at 515 n.5 (using similar calculation to award backpay). We agree

with the district court's conclusion that the DHRC's calculation is "logical as opposed to arbitrary, and . . . supported by substantial evidence in the record."

3. *Sufficiency of the evidence for award of emotional distress damages.* Simon Seeding also challenges the award of emotional distress damages. It points to other potential causes of Stapleton's distress and argues that expert testimony was required to support the award. Simon Seeding contends the award was not supported by substantial evidence.[5] We disagree.

A person proving discrimination in violation of Dubuque Ordinance section 8-3-3 is entitled to recover "damages for an injury caused by the discriminatory or unfair practice." Dubuque, Iowa, Code of Ordinances § 8-4-6(A)(1)(h). Similarly, the ICRA entitles a person proving discrimination under the Act to compensation for "actual damages." Iowa Code § 216.15(9)(*a*)(8). "We have held damages for emotional distress are a component of 'actual damages.'" *Dutcher v. Randall Foods*, 546 N.W.2d 889, 894 (Iowa 1996) (quoting *Chauffeurs, Teamsters & Helpers, Local Union No. 238*, 394 N.W.2d at 383). "A plaintiff need not

---

[5]Simon Seeding also argues the DHRC improperly increased the award based upon the consumer price index. On appeal from the panel's decision, Stapleton argued the award of the panel should be increased because cases the panel relied upon were ten to twenty years old and inflation, as evidenced by the consumer price index, justified such an increase.

The city's administrative code, section 3.24(2), provides that a commission can only "consider those issues actually presented to the hearing officer." Dubuque, Iowa, Admin. Code § 3.24(2). Simon Seeding points out the consumer price index argument was not raised before the panel. Simon Seeding argues the DHRC nonetheless impermissibly relied upon such evidence because of a newspaper article that was released, which quoted an officer of the DHRC. The officer stated the DHRC felt the award was "appropriate for 2015."

The consumer price index is mentioned nowhere in the DHRC's final decision, and the district court correctly declined to speculate that the DHRC relied on the consumer price index to increase the award.

show physical injury, outrageous conduct or severe distress to obtain an award for emotional distress" under the ICRA. *Id.* "Determining the amount of damage attributable to a defendant's conduct is a matter for the trier of fact." *Lynch I*, 454 N.W.2d at 836. "The adequacy of the award in a particular case depends on the unique facts of that case"; thus, comparison with other cases is of little value. *Id.* The verdict is inadequate or excessive when "uncontroverted facts show that it bears no reasonable relationship to the loss suffered." *Id.* at 837.

Whether Leo's conduct caused Stapleton's emotional distress was a question for the fact finder. Stapleton was in a halfway house and suffering from drug addiction relapses. Those stressors could make him more vulnerable to mental trauma from Leo's slurs. *See* Mika'il DeVeaux, *The Trauma of the Incarceration Experience*, 48 Harv. C.R.-C.L. L. Rev. 257, 258 (2013) (reviewing emotional impact of prison). Defense counsel vigorously cross-examined Stapleton, his mother, and his ex-girlfriend on these topics. The DHRC was entitled to credit their testimony that Stapleton's distress resulted from Leo's racial epithets. Stapleton described it as a "scar that never goes away." Stapleton's ex-girlfriend and mother testified that before his problems at Simon Seeding, he was "happy-go-lucky" while afterwards he was "irritable" and "agitated."

We disagree that expert testimony was required to support this award for emotional distress. Under different circumstances, we have reversed awards made without supporting expert testimony. In *Vaughn*, we reviewed an award of emotional distress damages under a common law theory of intentional infliction of emotional distress. 459 N.W.2d at 637. Howard Vaughn alleged religious discrimination after his supervisor made anti-Catholic remarks directed at Vaughn. *Id.* at 631.

At trial, when asked about emotional problems from the statements, Vaughn responded, "I've never really thought about it." *Id.* at 636. He testified that while working he felt "upset," "grouchy," and "nervous." *Id.* After the harassment he lost fifty pounds and became ill with colitis. *Id.* at 637. The court awarded emotional distress damages. *Id.* at 631–32. We noted the absence of expert testimony and concluded there was insufficient evidence to support the award. *Id.* at 637.

> While it is not clear from the record when plaintiff saw his physician, the physician did not testify at trial. The plaintiff simply does not have the medical expertise to explain the relationship of his work environment to physical symptoms which peaked three months after he left his employment. . . . The causal relationship between Mueller's conduct and plaintiff's symptoms is not within the common experience of a jury.

*Id.*

Under the ICRA, however, we have allowed emotional distress damages without expert testimony. *See, e.g., City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 537 (Iowa 1996). While the testimony of a physician or psychiatrist can help prove causation, in some instances this inquiry will be "so obvious as to be within the common knowledge of laypersons without the aid of expert testimony." *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990) (noting no need for expert testimony in such circumstances); *see, e.g., Hy-Vee Food Stores, Inc.*, 453 N.W.2d at 526 (relying on expert testimony from dermatologist about how plaintiff's skin condition worsened after harassment).

We have noted the lack of expert testimony when reviewing awards for emotional distress under the ICRA. In *City of Hampton*, an administrative law judge (ALJ) awarded $50,000 for emotional distress when an employee testified that she had become very upset by her

supervisor's threats to sue her and was losing sleep.  554 N.W.2d at 537. We reviewed prior emotional distress awards, stating,

> In awarding [the employee] $50,000 for her emotional distress, the ALJ relied almost solely on the testimony of Abbas and her daughter.  Abbas presented no medical evidence.  When considering the amount of damages, it is not particularly helpful to compare this with other cases. *Lynch*, 454 N.W.2d at 836.  Nevertheless, we note that this award exceeds any under similar circumstances in a civil rights case.  For example, in *Hamer v. Iowa Civil Rights Commission*, 472 N.W.2d 259, 266 (Iowa 1991), we approved an award of $5000 for emotional distress based on sex discrimination.  In *Lynch*, we approved an award of $10,000 based on a sexually hostile work environment, 454 N.W.2d at 836–37, and in *Hy-Vee Food Stores, . . .* we approved an award of $10,000 for emotional distress based on sex and national origin discrimination.  453 N.W.2d at 525–26.  In *Chauffeurs, Teamsters & Helpers Local Union No. 238 . . . ,* 394 N.W.2d [at] 384–84[,] we approved $15,000 as an award based on racial discrimination.

*Id.*  We concluded $50,000 was excessive and reduced the award to $20,000.  *Id.*  We did so "based on the relatively small amount of evidence supporting the award and the total lack of any medical or psychiatric evidence to support it," noting the ICRA does not allow for "punitive damages" disguised as an award for emotional distress.  *Id.*

Similarly, Stapleton relies solely on lay testimony.  He alleged no physical manifestations of the distress other than losing sleep.  The DHRC's award in this case is larger than other recent awards. Significantly, the panel awarded Stapleton $15,000, which the DHRC tripled without explanation.  But the DHRC is the ultimate fact finder, and we review the findings of that agency, not the panel.  Given the ongoing repetitive nature of Leo Simon's racially offensive epithets and the lay testimony as to how the mistreatment affected Stapleton, we cannot conclude the DHRC abused its discretion in increasing the award. The size of the award is supported by the record.

4. *Sufficiency of the evidence for award of attorney fees.* Finally, Simon Seeding argues the DHRC lacked the authority to increase the award of the panel's attorney fees by $1600, and the district court lacked the authority to increase the award by $4500 for the cost of the appeal. Simon Seeding does not otherwise challenge the reasonableness of the fees or hourly rate.

"Because attorneys' fee awards are a derogation of the common law, they 'are generally not recoverable as damages in the absence of a statute or a provision in a written contract.'" *Botsko*, 774 N.W.2d at 845 (quoting *Kent v. Emp't Appeal Bd.*, 498 N.W.2d 687, 689 (Iowa 1993)). When assessing whether attorney fees are allowed under a civil rights ordinance enacted pursuant to Iowa Code section 216.18, the relevant question "is whether the ordinance . . . contained an express provision clearly authorizing an award of attorneys' fees." *Id.* at 846. We reiterate the importance of fee awards in civil rights cases: "The reason a successful civil rights litigant is entitled to attorney fees 'is to ensure that private citizens can afford to pursue the legal actions necessary to advance the public interest vindicated by the policies of civil rights acts.'" *Lynch II*, 464 N.W.2d at 239 (quoting *Ayala v. Ctr. Line, Inc.*, 415 N.W.2d 603, 605 (Iowa 1987)). Nevertheless, we will not substitute "generalized language" for language "expressly authorizing the payment of attorneys' fees to the prevailing party." *Botsko*, 774 N.W.2d at 846.

Dubuque Ordinance section 8-4-6 allows the DHRC to take "remedial actions," including "[p]ayment to the complainant of damages for any injury caused by the discriminatory or unfair practice, which damages shall include . . . reasonable attorney fees." Dubuque, Iowa, Code of Ordinances § 8-4-6(A)(1)(h). The DHRC, when reviewing a panel's award, has "all the power it would have in initially making the

final decision." Dubuque, Iowa, Admin. Code § 3.24(2). The DHRC may modify the panel's award, including the panel's award of attorney fees. We hold this Dubuque Ordinance 8-4-6 permits an appellate fee award. "District courts exercise appellate jurisdiction over agency actions on petitions for judicial review." *Christiansen*, 831 N.W.2d at 186. Section 8-4-6 is worded similarly to Iowa Code section 216.15(9)(*a*)(8) ("Payment to the complainant of damages for an injury caused by the discriminatory or unfair practice which damages shall include but are not limited to actual damages, court costs and reasonable attorney fees."). We have allowed an award of appellate attorney fees under this section. *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 898–99 (Iowa 1990) ("To the extent that Landals was entitled to an award of attorney fees for his litigation expense before the district court, he is likewise entitled to an award of fees necessitated by this appeal."). The DHRC and district court properly awarded fees Stapleton incurred after the panel award.

**IV. Disposition.**

For those reasons, we affirm the judgment of the district court upholding the decision of the DHRC.

**DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel and Wiggins, JJ., who concur specially.

#16–1014, *Simon Seeding & Sod v. Dubuque Human Rights Comm'n*

**APPEL, Justice (concurring specially).**

I concur in the majority opinion but write separately to emphasize four points.

First, the Iowa legislature has directed us to broadly construe the Iowa Civil Rights Act to accomplish its remedial purposes. Iowa Code § 216.18(1) (2015). The majority opinion is consistent with that legislative direction.

Second, the Iowa Civil Rights Act has fundamental differences from the Federal Civil Rights Act. The structure is different, the legislative history is different, and in many places the Iowa statute utilizes different statutory language than federal law. *See Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 9–10 (Iowa 2014); *accord DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 7 (Iowa 2009) ("[W]e must be mindful not to substitute 'the language of the federal statutes for the clear words of the Iowa Civil Rights Act.'" (quoting *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). These distinctive features are among the factors which must be taken into account in evaluating whether federal authority should be considered persuasive in the interpretation of state law.

Third, as the majority clearly demonstrates, the Iowa legislature adopted a traditional fact-based numerosity analysis by using the term-of-art "regularly employed" rather than the more formulaic approach embraced in federal law. While the federal approach is said to provide a "bright line," a cursory review of the federal caselaw struggling with application of the federal numerosity requirement provides a serious challenge to that assumption. *See generally* David C. Butow, Note, *Counting Your Employees for Purposes of Title VII: It's Not as Easy as One, Two, Three*, 53 Wash. & Lee L. Rev. 1103 (1996); Jacqueline Louise

Williams, Note, *The Flimsy Yardstick: How Many Employees Does it Take to Defeat a Title VII Discrimination Claim?*, 18 Cardozo L. Rev. 221 (1996). But, more importantly, the Iowa legislature has concluded that a fact-driven numerosity analysis is more likely to advance the purposes of the Iowa Civil Rights Act rather than an arbitrary bright-line numerosity requirement that does not take into account differences in the employment practices and calendars of specific industries and employers. The Iowa legislature is free to choose a more tailored fact-bound test of regular employment rather than a blunt and somewhat arbitrary bright-line approach of federal law.

Fourth, when a court is urged to adopt a bright-line interpretation of a statutory provision, the question is usually not simply whether the bright line is workable or provides for certainty and predictability. Also of import, and sometimes of more importance, is where the proposed bright line has been located on the policy spectrum.

Here, Congress has elected to include some seasonal employers who employ the requisite number of employees for a relatively long period of time, but exclude employers who employ seasonal employees for a shorter period of time. Iowa has deliberately chosen a different substantive policy.

It is, of course, not surprising that the national political process, in which widely disparate federal actors have a voice, has produced a different policy than the more localized political process in Iowa. In any event, this case does not simply involve the dry methodological question of whether a bright-line approach to numerosity is better than a fact-based approach. It involves a fundamental policy question regarding the scope of coverage of employers who hire short-term seasonal workers. The majority opinion correctly hews to the policy choice embraced by the

Iowa legislature and does not substitute a federal legislative choice made as a result of a materially different political process that produced a substantially different legislative result.

Wiggins, J., joins this special concurrence.